IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Criminal Action No. 18-cr-00209-CMA-11

UNITED STATES OF AMERICA,

    Plaintiff,

v.

11. JOSE SANTIAGO-MESINAS,

    Defendant.

**ORDER DENYING DEFENDANT'S RENEWED MOTION TO SUPPRESS EVIDENCE AND VACATING DECEMBER 17, 2018, HEARING**

This matter is before the Court on Defendant Jose Santiago-Mesinas's Renewed Motion to Suppress Direct and Derivative Evidence Obtained From Unlawful Searches and Seizures Based Upon Newly-Presented Evidence (the "Renewed Motion to Suppress"). (Doc. # 265.) Having fully considered the parties' arguments for and against suppression of evidence, the Court finds that an evidentiary hearing is unnecessary and denies Defendant's Renewed Motion to Suppress.

### I.    BACKGROUND

**A.   FACTUAL BACKGROUND**

The Court's October 8, 2018, Order Granting Defendant's Motion for a Separate Trial (Doc. # 252) recites the applicable factual and procedural background of this case and is incorporated herein by reference. Additional factual background and procedural

history will be detailed in this Order only to the extent necessary to address the instant motion.

This case arises out of an alleged conspiracy among sixteen defendants, including Defendant, to "knowingly and intentionally conspire to distribute or possess with the intent to distribute" various amounts of methamphetamine and cocaine between July 1, 2015, and January 1, 2018. (Doc. # 1 at 1.)

According to the Government, the Drug Enforcement Administration ("DEA") initiated an investigation into the drug trafficking activities of some of Defendant's former codefendants, including Omar Obeso-Gastelum, Adrian Pallanes-Lujano, and Abraham Rivera-Flores, in December 2016. (Doc. # 318 at 2–14.) From lawfully intercepted communications between the codefendants, the Government believed that a newly-purchased truck would serve as a "load vehicle" to transport twenty pounds of methamphetamine from Arizona to Colorado on April 3, 2017, and that Pallanes-Lujano would escort the load vehicle part of the way to its final destination in Aurora, Colorado. *See* (*id.*)

On the morning of April 3, 2017, the DEA's task force officers asked a local DEA special agent, Christopher Trocola of the DEA Yuma Resident Office, to identify any vehicle potentially being escorted by Pallanes-Lujano. (*Id*. at 15.) DEA Special Agent Trocola observed that a maroon Chevy Avalanche with temporary Arizona license plate number 047648T was travelling in tandem with Pallanes-Lujano's vehicle. (*Id*.) DEA Task Force Officer Tony Collett learned that the Avalanche was registered to a Jose Santiago-Mesinas in San Luis, Arizona. (*Id*.) "Based on these facts," task force officers

believed the Avalanche was the load vehicle transporting methamphetamine to Colorado. (*Id.* at 16.)

That afternoon, after lawfully intercepting a phone call between Obeso-Gastelum and Pallanes-Lujano in which Obeso-Gastelum directed Pallanes-Lujano to tell the driver of the load vehicle to stop at a hotel for the night, task force officers used pen registers on those defendants' phones and observed that Pallanes-Lujano and Rivera-Flores soon thereafter called a telephone number, 760-397-6242, subscribed to a Jose Santiago at Sprint's generic mailing address. (*Id.* at 17.) The Government applied for and United States Magistrate Judge Michael J. Watanabe quickly issued a search warrant allowing the collection of GPS information for and the tracking of the telephone number ending in -6242 and subscribed to a Jose Santiago (the "April 3 Phone Warrant"). (*Id.*); *see* (Doc. # 233-24.)

Task force officers continued to surveil the Avalanche in the afternoon and evening of April 3, 2017. (Doc. # 318 at 18.) They observed the Avalanche travelling northbound on I-25 outside of Santa Fe, New Mexico, for example, and noted that the Avalanche's movement "positively correlated with" the GPS data then coming in from Jose Santiago's telephone number ending in -6242. (*Id.*) At approximately 12:40 AM on April 4, 2017, task force officers observed that the Avalanche pulled onto the shoulder of I-25 on "a deserted stretch of highway" and during "a significant snow storm" and activated its hazard lights, (*id.*); the Avalanche had sustained a flat tire. Task Force Officer Kristie Allen contacted Colorado State Patrol Trooper C. Baillargeon and asked him to contact the driver of the Avalanche. (*Id.* at 18–19.)

Trooper Baillargeon contacted the vehicle at approximately 1:25 AM on April 4, 2017, and identified the driver as Defendant from his California driver's license. (*Id.* at 19.) Trooper Baillargeon had difficulty conversing with Defendant because of a language barrier; he called Task Force Officer Collett, who is conversant in Spanish, and handed his phone to Defendant. (*Id.*) Defendant told Task Force Officer Collett that he was coming from Yuma, Arizona, but later said he was coming from San Luis, near Phoenix, Arizona. (*Id.*) Defendant also told Task Force Officer Collett that he was traveling to Denver for construction work, though Trooper Baillargeon reported seeing no clothing—and specifically no construction wear—to Task Force Officer Collett. (*Id.*) Finally, upon Task Force Officer Collett's inquiry, Defendant stated that he thought he had bought the Avalanche from an auto company a week prior but did not remember its name. (*Id.*) Task Force Officer then told Defendant that the Avalanche was going to be seized for further investigation because circumstances were suspicious and that the officers planned to obtain a warrant to search the truck. (*Id.*) Trooper Baillargeon subsequently sealed the Avalanche and delivered it to a secure Colorado State Patrol facility. (*Id.* at 20.) Another Colorado State Patrol trooper took Defendant to a nearby motel. (*Id.* at 19.)

Later in the morning of April 4, 2017, task force officers lawfully intercepted a phone call from Pallanes-Lujano to Obeso-Gastelum, in which Pallanes-Lujano told Obeso-Gastelum that law enforcement "came up from behind" the driver of "the vehicle," made him stop, and "took the car to the impound." (*Id.* at 21.) Pallanes-Lujano also described how the driver of the vehicle didn't speak English, so law enforcement

4

"called another cop" and how the driver "stayed at a hotel and then he jumped to another one." (*Id*.) Obeso-Gastelum later sent a text message to Pallanes-Lujano, asking if "the work was well hidden." (*Id.*) Task force officers believed that Obeso-Gastelum and Pallanes-Lujano were discussing the stop of Defendant and the seizure of the Avalanche and methamphetamine hidden within it. *See* (*id.*)

On April 6, 2017, task force officers applied for a search warrant for the Avalanche. (*Id.* at 22); *see* (Doc. # 233-27.) Task Force Officer Allen submitted the supporting affidavit and described how the intercepted communications described above led her to "believe[] that [there was] . . . probable cause to search the [Avalanche] for drugs and to seize evidence of drug trafficking found in the [Avalanche.]" (Doc. # 233-27 at 24.) Relevant here, Task Force Officer Allen described Officer Baillargeon's and Task Force Officer Collett's conversations with Defendant when he was on the side of I-25 early in the morning of April 4, 2017:

> During TFO Collett's conversation with [Defendant], [Defendant] told TFO Collett that he was traveling to Denver for construction work. Trooper Baillargeon told TFO Collett that he did not observe any clothing in the vehicle, and particularly did not see any clothing related to construction work. TFO Collett asked [Defendant] where he was coming from and [Defendant] initially said Yuma (Arizona), then later said San Luis, near Phoenix. TFO Collett asked [Defendant] if he bought the [Avalanche] from a private party or dealership. [Defendant] said he thought he bought the [Avalanche] about a week ago from an auto company but he couldn't remember the name of the company.

(*Id.* at 21.)

United States Judge Michael J. Watanabe authorized the search warrant on the same day (the "April 6 Car Warrant"). (*Id.* at 1.)

5

Pursuant to the April 6 Car Warrant, task force officers searched the Avalanche on April 6, 2017.  (Doc. # 318 at 22.)  A total of twenty packages of methamphetamine, totaling 25.68 pounds at 99% purity, were seized from hidden, aftermarket compartments in the Avalanche.  (*Id*.)

**B.     PROCEDURAL HISTORY**

A federal grand jury indicted Defendant and his former codefendants on "knowingly and intentionally conspir [ing] to distribute or possess with the intent to distribute" various amounts of methamphetamine and cocaine between July 1, 2015, and January 1, 2018, (Count One) on May 2, 2018.  (*Id.*)  Defendant was also indicted on "travel[ling] on interstate commerce with the intent to promote . . . an unlawful activity, specifically[, the] conspiracy to distribute or possess with the intent to distribute narcotics" (Count Ten) and on "knowingly or intentionally distribut[ing] and possess[ing] with the intent to distribute 500 grams or more of a mixture of substance" containing methamphetamine (Count Eleven).  (*Id*. at 6.)

On June 19, 2018, Defendant filed a Motion for a Separate Trial pursuant to Federal Rule of Criminal Procedure 14(a).  (Doc. # 172.)  Defendant asserted that though he was charged in only three of the 26 counts and his activities occurred on a single day, it would be "very difficult" for the jury to give his case "individual consideration" because of "the presentation by the [Government] of evidence of the additional acts and transactions by co-defendants."  (*Id.* at 7.)  The Government responded in opposition for Plaintiff's request on August 2, 2018 (Doc. # 212), and Defendant replied on August 3, 2018 (Doc. # 218).

On August 2, 2018, Defendant filed his First Motion to Suppress Direct and Derivative Evidence (the "First Motion to Suppress"), arguing that evidence against him obtained as a result of what he described as "the April 3, 2017, improper request for location and data/GPS information obtained from [the cellular telephone number ending in -6242], the unlawful detention and interrogation of [him], and the subsequent unlawful search and seizure of a 2004 maroon Chevrolet Avalanche" warranted suppression. (Doc. # 209.) Defendant took issue with three actions taken by the Government: (1) the task force officers' application for and the Court's issuance of the April 3 Phone Warrant; (2) law enforcement's questioning of Defendant in the early morning hours of April 4, 2017; and (3) the task force officers' application for and the Court's issuance of the April 6 Car Warrant. (*Id.*) The Government responded to the First Motion to Suppress on August 16, 2018 (Doc. # 233), to which Defendant replied on August 17, 2018 (Doc. # 234).

In his Reply, Defendant explained that just two days prior, on August 15, 2018, the Government disclosed to Defendant a report by Trooper Baillargeon in which Trooper Baillargeon recounted "observing multiple extension cords and **construction tools** on the passenger side floorboard" of the Avalanche; the Government characterized this report to Defendant as not "add[ing] anything new." (*Id.* at 3–4) (quoting (Doc. # 234-1) (emphasis added by Defendant)). Defendant disagreed, stating that "Trooper Baillargeon's original statements used in the warrant application that he did not see any 'construction clothing' in the vehicle . . . was misleading to the reviewer of the warrant application that [Defendant] was being disingenuous by stating that he

7

was traveling to Denver for construction work," given the information in the newly-disclosed report by Trooper Baillargeon. (*Id*. at 5.)

The Court conducted a hearing on Defendant's Motion for a Separate Trial and his First Motion to Suppress on August 21, 2018. *See* (Doc. ## 235, 253.) Task Force Officer Collett, Trooper Baillargeon, and Task Force Officer Allen testified about the DEA's investigations and their knowledge of Defendant. (*Id.*) Defendant asked Task Force Officer Collett questions about what Trooper Baillargeon reported seeing in the Avalanche when they spoke in the early morning on April 4, 2017 (Doc. # 253 at 95–97), and asked Trooper Baillargeon numerous questions about what construction equipment he saw in the Avalanche (*id.* at 107–09). Defendant also admitted into evidence and reviewed with Trooper Baillargeon pictures of what was stored in the Avalanche when it was sealed and delivered to the Colorado State Patrol facility; these images showed extension cords and other construction equipment. (*Id.*)

At the end of the hearing, the Court took Defendant's Motion for a Separate Trial under advisement, expressing its concern with Defendant's right to a speedy trial. (Doc. # 253 at 143–46.) This Court subsequently granted Defendant's Motion for a Separate Trial pursuant to Federal Rule of Criminal Procedure 15(a) upon determining that a trying Defendant in a joint trial with his codefendants would impermissibly prejudice him. (Doc. # 252.)

Also at the end of the hearing on August 21, 2018, the Court denied Defendant's First Motion to Suppress. (*Id.* at 130–43.) As to the April 6 Car Warrant, which is at issue in the motion presently before the Court, the Court ruled that "law enforcement

8

had probable cause to believe that the Avalanche contained contraband and evidence of criminal activity." (*Id.* at 140.) With regard to the construction equipment and clothing, the Court explained:

> [Defendant's] concerns about Officer Baillargeon's new statement clarifying that he did see construction clothing and equipment in the car does not change the Court's analysis. That initial statement was far from the sole basis for Officer Collett and Officer Allen's probable cause for believing the Avalanche contained contraband or evidence.
> 
> As the testimony showed today, Officers Collett and Allen's probable cause was based on the long-running investigation, including the plan for the loaded drugs to be transported into Colorado in a truck on April 3rd. The communications between the defendant and the phone number ending in 6242 at the same time the truck was en route to Colorado. The similarity of the names of the user and telephone . . . and the owner/driver of the truck. The positive correlation between the GPS data from that telephone number and the Chevrolet Avalanche's route.
> 
> The Court is, therefore, satisfied that Officer Baillargeon's earlier uncorrected statement about the absence of construction clothing and equipment was not necessary to the finding of probable cause.

(*Id.* at 142–43.)

Defendant filed his Renewed Motion to Suppress on October 25, 2018. (Doc. # 265.) In addition to recounting the aforementioned facts, Defendant reports:

> After the August 21, 2018, evidentiary hearing, the [Government] disclosed to [Defendant] that on June 29, 2017, the federal government, through the U.S. Attorney for the District of Arizona, . . . filed an Application for Interception of Wire Communications in the United States District Court for the District of Arizona, and obtained an order for the interception of wire communications for [two telephone numbers alleged used by Rivera-Flores], phone number (760) 397-6242 (referred to as Defendant Santiago's Telephone #1), phone number (719) 679-7919 (referred to as Defendant Santiago's Telephone #2), and [another phone number].

(*Id.* at 12–13); *see* (Doc. # 265-1.) In its Response, filed November 27, 2018, the Government does not contest that such a wiretap application was made and issued in case number WT-17-22-PHX-DGC (the "Arizona Wiretap Order"). (Doc. # 318 at 29–

40.) Defendant filed his Reply in support of his Renewed Motion to Suppress on November 29, 2018. (Doc. # 326.) A hearing on Defendant's Renewed Motion to Suppress is set for December 17, 2018, at 3:00 PM. (Doc. # 270.)

Defendant has filed two other motions that remain pending: a Motion to Dismiss or, in the Alternative, For Bill of Particulars (Doc. # 239), and a Motion for Pretrial Disclosure of Statements and Admissions to be Offered Under Federal Rule of Evidence 801(d), Any Known Prior Inconsistent Statements of a Declarant-Witness Under Rule 801(d)(1)(A), and to Order a *James* Hearing (Doc. # 241). The Court will address these motions in due time.

## II.   ANALYSIS

Defendant raises two arguments in his Renewed Motion to Suppress. (Doc. # 265.) First, Defendant challenges the April 6 Car Warrant under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), on the grounds that in the affidavit in support of its warrant application, the Government made "inconsistent and misleading representations . . . in reckless disregard for the truth" regarding the presence of construction equipment and the absence of construction clothing in the Avalanche. (Doc. # 265 at 10–12.) Second, Defendant argues that the Government "failed to demonstrate necessity in its application for the Arizona Wiretap Order." (*Id.* at 12–18.) The Court considers each argument in turn.

**A.     AFFIDAVIT IN SUPPORT OF APPLICATION FOR APRIL 6 CAR WARRANT**

1. Relevant Facts

In the Government's April 6, 2017, application for a search warrant for the Avalanche, affiant Task Force Officer Allen recounted Officer Baillargeon's and Task Force Officer Collett's interactions with Defendant and Officer Baillargeon's observations about the Avalanche.  (Doc. # 233-27.)  In addition to describing Defendant's statements about where he was coming from and how he acquired the Avalanche, the affiant wrote, "During TFO Collett's conversation with [Defendant], [Defendant] told TFO Collett that he was traveling to Denver for construction work.  Trooper Baillargeon told TFO Collett that he did not observe any clothing in the vehicle, and particularly did not see any clothing related to construction work."  (*Id*. at 21.)

On August 15, 2018, two days before the hearing on Defendant's First Motion to Suppress, the Government disclosed a report by Trooper Baillargeon, dated August 13, 2018, in which Trooper Baillargeon recounted looking into the Avalanche when it was he made contact with Defendant:

> [Defendant] voluntarily opened the passenger side door as I observed multiple extension cords and construction tools on the passenger side floorboard.  There was also a bucket and several more construction tools on the rear seat of the pickup in plain view.  There was no clothing, luggage, or any other signs associated with long distance travel.

(Doc. # 234-1 at 3.)

In his Reply in support of his First Motion to Suppress, Defendant emphasized the difference between the affiant's statement in the Government's application for the warrant that "Trooper Baillargeon told TFO Collett that he did not observe . . . any

clothing related to construction work" and Trooper Baillargeon's later-written report that he observed construction tools in the Avalanche. (Doc. # 234 at 4.) Defendant argued that Trooper Baillargeon's observation of construction tools "provided credence to [Defendant's] statement that he was traveling to Denver to pursue construction work" and that the Government either "intentionally omitted, or in reckless disregard of the truth, failed to report" the presence of construction tools in the affidavit. (*Id*.) Thus, Defendant argued, the Government's application for the warrant was "misleading to the reviewer of the warrant application" to the extent that it implied Defendant "was being disingenuous by stating that he was traveling to Denver for construction work." (*Id*. at 5.) Defendant questioned Task Force Officer Collett and Trooper Baillargeon about the construction tools in the Avalanche at the August 21, 2018, hearing on his First Motion to Suppress. (Doc. # 253 at 95–97, 107–09.)

The Court was not persuaded by Defendant's argument regarding the presence of construction tools in the Avalanche and denied Defendant's First Motion to Suppress from the bench. As it has previously described in this Order, the Court explained:

> [Defendant's] concerns about Officer Baillargeon's new statement clarifying that he did see construction clothing and equipment in the car does not change the Court's analysis. That initial statement was far from the sole basis for Officer Collett and Officer Allen's probable cause for believing the Avalanche contained contraband or evidence.
> . . .
> The Court is, therefore, satisfied that Officer Baillargeon's earlier uncorrected statement about the absence of construction clothing and equipment was not necessary to the finding of probable cause.

(*Id.* at 142–43.)

2. Controlling Authority

Defendant now "requests a review under *Franks v. Delaware* of the [G]overnment's inconsistent and misleading representations in the search affidavit made in reckless disregard of the truth" and argues that these misrepresentations about the presence or absence of construction clothing and equipment "undermine a finding of probable cause." (Doc. # 265 at 11–12.)

The Supreme Court held in *Franks*:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and **if the allegedly false statement is necessary to the finding of probable cause**, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155–56 (emphasis added); *see United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (describing and applying the holding of *Franks*). In determining whether a hearing is required, the Supreme Court emphasized that to mandate an evidentiary hearing, the challenger must make "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171. Of particular importance to Defendant's Renewed Motion to Suppress is the Supreme Court's statement that "if, when material that is subject of the alleged falsity or reckless disregard is set to one side, there

13

remains **sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required**." *Id*. at 171–72 (emphasis added).

3. Discussion

This Court has already concluded that, even setting aside the affiant's statement concerning the absence of construction clothing in the Avalanche, there was still sufficient content in the Government's application for the search warrant to support a finding of probable cause. *See* (Doc. # 253 at 142–43.) It explicitly held as much in its oral ruling on Defendant's First Motion to Suppress, as the Court has now twice described in this Order. *See* (*id.*) Defendant's Renewed Motion to Suppress does not make any new factual allegations or new legal arguments; Defendant merely reprises the argument he made in its Reply on his First Motion to Suppress and at the August 21, 2018, hearing. The Court declines to again explain how the DEA's long-running investigation gave rise to probable cause to believe that the Avalanche contained contraband or evidence.

Because the affiant's statement about the absence of construction clothing in the Avalanche was not necessary to Magistrate Judge Watanabe's finding of probable cause, the Fourth Amendment does not require that a *Franks* hearing be held at Defendant's request and does not require that the evidence discovered pursuant to the April 6 Car Warrant be suppressed. *See Franks*, 438 U.S. at 155–56.

**B.     APPLICATION FOR THE ARIZONA WIRETAP ORDER**

Defendant's challenge to the Arizona Wiretap Order is either premature or moot. As Defendant himself states, "[p]retrial discovery . . . thus far has failed to disclose

whether evidence of any such electronic communication [by Defendant] was derived as a result of the Arizona wiretap warrant." (Doc. # 326 at 8.) The Government states that Defendant "was not a party to any intercepted communications." (Doc. # 318 at 29.) Defendant concedes that "[s]hould the Government disclose that no evidence of electronic communications to or from [Defendant] was obtained as a result of the execution of the Arizona [W]iretap [O]rder, . . . then there is nothing to suppress, and [Defendant's] motion is moot." (Doc. # 326 at 8.) It therefore appears to the Court that there is nothing to suppress at this point, and Defendant's second argument is moot.

Should further pretrial discovery disclose that the Government intercepted communications by or with Defendant under the Arizona Wiretap Order and intends to use them as evidence against Defendant, this Court will then entertain challenges to the Arizona Wiretap Order.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Renewed Motion to Suppress (Doc. # 265.) It is

FURTHER ORDERED that the hearing on Defendant's Renewed Motion to Suppress set for December 17, 2018, at 3:00 PM (Doc. # 270) is VACATED.

DATED: December 14, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

15